Your Honor, Jill Kraft on behalf of Renee Credeur. In 2008, the Americans with Disabilities Act was amended. At that time, Congress acknowledged that there were 43 million Americans with a physical or mental impairment that were essentially kept out of the workplace for failure to accommodate. This case involves two, I think, essential strains. Number one is, can the Louisiana Attorney General, and did the Louisiana Attorney General, when it dealt with Renee Credeur, who was suffering from kidney failure, an attorney, defy after-the-fact essential functions to include she has to have her behind in a chair, behind a desk at the Attorney General's office. What's striking about the essential function analysis in this case is the fact that the evidence showed when Renee had her first transplant in 2010, she worked from home. She continued to function as a medical malpractice attorney effectively. There were several bouts over time, as the court knows from the facts, where she had rejection issues, she had exposure issues, and continued to work from home. There was not an issue. That was an accommodation, though, wasn't it? Yes, sir. It absolutely was an accommodation. So then the question becomes, why is it when a new supervisor arrives, Ms. Sonia Millett, all of a sudden that accommodation, which was reasonable then, is all of a sudden unreasonable now? Well, an accommodation could be reasonable for a limited period of time, couldn't it? Except that the ADA doesn't say we're here only to provide temporary accommodations. What the ADA bespeaks is the provision of accommodations. In this particular circumstance, one of the problems, I think, with the district court's opinion is that it kind of infused the rationale about an undue burden. Well, this was unduly burdensome. If that's the case, to determine undue burden under the Americans with Disabilities Act, that burden of proof is on the defendant. To prove by a preponderance of the evidence. It's very statute-specific and has been there since 1992. Yet in this case, the court on summary judgment makes a number of credibility decisions and factual determinations favorable to the defendant, not the least of which is, well, I believe at this point now, 2013, physical presence at the office with her behind a desk is now an essential function of employment. As we pointed out in the record evidence, Ms. Allen herself testified that she was totally aware that a non-disabled lawyer in the same division, Bill Belsom... Is it the same division or is one civil and one litigation or something? They're both civil in the civil division. Okay, because I thought they said in their brief that one was in the civil division, one was in the litigation. I don't know if it really matters, but they, I think, make a distinction. Right, and I brought her testimony with me just to make sure, and it's at record 667 to 673, I believe, is the whole site. Okay, so can you go over all the evidence that you think, you've got your client's testimony, but there's an issue about whether that's enough. So what is the other evidence? The other evidence, as it relates to her specifically, is her doctor's documentation, and as the court will recall, one of the one of the big says that you can be at home, that you don't have to be in the office. Aside from the fact that they did it for her several times, which nobody contradicts. But, and then there's somebody else who, the medical, married to the medical person who's in the civil division. Same division, right. Married to, and then there's some former supervisor who said it wasn't required to be in the office. Is that right? There's a present supervisor who said that his only concern, David Sanders, was that he thought, yes, you can do everything you need to do as a lawyer from home, but we have this need for collegiality, and so folks need to be in the office to bounce ideas off of each other. That was essentially his testimony. There was also testimony, as it relates to one of the secretaries in the medical malpractice division within civil, who also was similarly accommodated. The question, in my opinion, for the purposes of this discussion is, as you described, Judge Graves, is an accommodation something that is only designed to be temporary? In this particular circumstance, Renee Crater had no problems. She did her job by all accounts, and including Judge Elrod, all of her supervisors. She did her job. She was never written up. She had no issues. Then all of a sudden, she's got another recurrent issue, secondary to this kidney transplant. Now all of a sudden, in 2013, everything that has happened for the last several years is somehow, we can't do it anymore? You allowed a non-disabled lawyer in the same division to work from home in Georgia simply because his wife was in medical school, but you can't allow a disabled lawyer in your own backyard to do the same? Well, and that gets me back to what I'm talking about for a limited period of time. You could accommodate somebody, but you could make a determination that I'm going to accommodate you during your period of recovery, which may be three months or six months, but I'm anticipating, optimistically, that there will be a recovery sufficient that will allow that you can come back into the office. But aren't we talking about the definition of essential function, and don't we have to give some deference to the employer's view of what an essential function is? And I guess that's one of my questions, and so let me just pack them all in. And then the other one is, in terms of the definition of an essential function, is it your view that they offered no explanation or definition of essential function, and the fact that it required presence in that office, until after Ms. Crater needed some accommodation? Yes, that is exactly our position, because they did it before, they continue to do it, and then we have a new supervisor, Ms. Millett. As you know from the court jurisprudence, you have that intervening supervisor who comes in and makes no bones about it. In fact, when I asked her about, is there some sort of policy about working from home, this is in Record 671. I'm looking for any policies, is my question. Or, you know, whether they're I'm looking to find out if there are any parameters. That's about working from home. Now, what she says, I don't know that there's a policy that specifies that. The problem in this case, from a credibility standpoint, on summary judgment, is the fact that there's no such written understanding, nobody's screaming, Renee has to be physically present in the office, until 2013. They didn't have a job description, did they? No, they did not. In fact, when I asked the human resource director, is there some sort of job description? No. They relied entirely on their testimony. She needs to be physically present in the office. Did the new supervisor bring home the guy from Georgia? No. But she was not his supervisor? She said when that occurred between 2010 and 2011, she was not his supervisor. She was in the civil division, she had some awareness of it, but she was not his supervisor. And frankly, as many times as I ask questions in this case, I can't say, gee, I don't remember, I don't know, we don't have any records, but we know what happened. The problem, fundamentally, also in this case is we have two divergent claims. We have the discrimination harassment component, which I give you, triggers on whether or not she was a qualified individual with a disability. The retaliation claims, however, do not. Can I add, on the retaliation, it's my understanding that you have brought not an FMLA claim, but that you're using the evidence that the FM, the thing was changed from not being FMLA as evidence of retaliation. Is that right? Or part of the harassment? Part of the harassment. Part of the retaliatory harassment, yes. Okay, so there's not a straight up, you should have counted my FMLA as FMLA, but you're saying that was part of the ongoing, that you didn't treat her poorly. In reversing that decision, here's what happened to Renee Kramer. In among that, and if you look at the constellation, which were most, we must do under Morgan and Harris, for the purposes of a harassment claim, and White, you look at what was going on to her at that time. She gets a document called last chance agreement, which the district court said was merely an illustration of her deficiencies in performance. Well, then why are you calling it last chance? The last line in that document, which I bold printed in my brief, says failure to comply can result in termination. So what is it? Then, with respect to the FMLA, she applies, she's qualified, they say, oops, you're not, and what's the effect of that? She lost her health insurance. This is a kidney transplant person who's got rejection issues and now no health insurance. In addition to that, we have in the record the evidence of the fact they're sending her all of these things saying, we need your doctor now to fill out this three page form. Wait, no, we're kidding. He filled out the three, now we want a six. No, we're kidding, we want another one. These are not legitimate barriers. These are legitimate inquiries. They're just meant to be more hoops to jump through. Eventually you won't jump through the hoop and we got you. You're quick and we got you. Same thing with respect to the evidence about, we now need you to fill out these timesheets. Now, remember, this is during a period of time where they say, we're not paying you, Renee, you're on leave without pay, hence no health insurance. So she says, rightfully so, and her supervisor, Rayno, verified it. The whole time I'm out and you're not paying me, I was still working. My supervisor, Mr. Rayno, was contacting me and giving me assignments to do. So then the AG's office comes in and says, well, you need to go back for several months and fill out daily timesheets and tell us what you did every day. She says, I can't. I worked for sure, but I can't and I can't because I sure don't want to be wrong. And that became a big hullabaloo with threats of, if you don't fill out these sheets, you can't come back to work. If you don't turn in your driver's license, you can't come back to work. You can't have health insurance. Now we'll let you back, if you come back. We have a last-chance agreement, which the district court... Well, I mean, if she wanted to be paid, though, and she's supposed to be out not working, it would seem that she would say, I did such and such, wouldn't it? She actually identified for them the task, which, frankly, were assigned by her supervisor, who said, I need you to do this on this file, this kind of thing. But honestly, Judge Elrod, that undercuts the commitment that this woman had to that job. That job was her life, period. And it doesn't require that she come in and say, okay, let me submit daily timesheets, because they already told her, you're on leave without pay. No choice. No FMLA, you're on HELWOP, period, end of story. So she's not claiming that, like, Louisiana, I assume, has something like Texas has, that you can get paid for your work. No. But she's not claiming the money. She's just saying that's yet another example of the treatment. Yes. Okay. And she made it clear to them, including in emails and follow-up complaints about it, to human resources. Look, I don't want to sign this. If I do, I'm concerned about some sort of payroll fraud. Okay. That's the scrutiny under which she operated. Can you point us to some authority? I think there's a kind of a common-sense view that most people have that says, well, you can do something temporarily, but you don't have to do it. You're being generous by letting somebody do something at home, do something different, but you don't mean to set a precedent that you're going to be doing that for everybody all the time. Tell us how that doesn't comport with the law. It's the same type of question that Judge Graves asked you earlier. Can you succinctly give us the authority that would help us navigate that issue? Yes, ma'am. And I can do so when you define reasonable accommodation, as I indicated to Judge Graves. It affords the defendant the right to say an accommodation imposes an undue burden. It does. But it very clearly says that it is their obligation to prove an undue burden by a preponderance of the evidence. And that comes from the analysis. When you look at cases like Cotrera was my case, a blind woman working in a library. What happened in Cotrera, she goes to walk into HR saying, help, help, I need an accommodation. They fire her. District Court dismisses and says, wait a minute. The proper onus shouldn't necessarily be placed entirely on the disabled employee. What this court said is the employer has an obligation when it knows or has reason to believe that somebody's disabled and accommodation might be needed to begin the interactive process. That's why in the ADA, I think that mindset is, yes, they can come in and say it's bad, it's terrible, and it's awful, but it's their obligation to prove it by a preponderance in the statute when it defines. Thank you. Thank you. Good morning, Your Honor. Good morning. Would it be okay if you started there? Start where, Your Honor? With whether or not it's... Introducing myself, Randy Robert. I want you to introduce yourself. I don't want to cut you off from that at all. My name is Randy Robert, and I'm here on behalf of the state of Louisiana through the office of the Louisiana Attorney General. And I'd be happy to start wherever you'd like, Your Honor. Do you agree that your client bears the burden of showing that the accommodation has become an undue burden? And if not, why not? I don't agree with that, Your Honor. And I think that if you look at the very beginning of this accommodation, which was done in a written strategy memo in October of 2013, and that strategy memo laid out the nature of the accommodation and what the intended goal of accommodation was. And when you look at that strategy memo, it specifically says that we're allowing you this accommodation to work from home to give you an opportunity to integrate yourself back into the workplace. That's what the strategy memo said in October of 2013. That was the goal all along, so that it was never intended from the very beginning to be and was never granted as any kind of a permanent accommodation of working from home. Regardless of whether or not your client had granted it as a permanent accommodation, the question is, why isn't she entitled to that accommodation, barring your ability to show an undue burden? Well, because workplace attendance is an essential function at the Attorney General's office of somebody doing litigation, and it always has been. And that was recognized as that strategy memo. We're going to allow you some leeway here to get yourself back into the office, but that's an essential function of what you need to do in order to do the job of a litigation attorney in a medical malpractice. What evidence in the record tells us that workplace attendance was an essential function and always has been, as you just said? What evidence in the record tells us that workplace attendance was an essential function? There was a written policy which laid out the specific requirement that there be regular attendance in the workplace. But the words of the Attorney General's office all the way through have been it's something that you need to be in the workplace. And the people who testify... What words are in this file that say that? Well, if you look at, like I said, first of all, when you look at the strategy memo, you will see that the words there indicated that this was intended to get her back into the office, that it was not intended to allow her just to work from home full-time. If you look at the nature of the position, she testified... But it did not say in that memo that it was anything about, well, because you must be in the office, this is only... It doesn't recognize that that's a... The memo is silent on the point. Silent to the extent that it doesn't have a pronouncement that says, part of your job is, must be working from home in the memo. I mean, you must be working in the office in the actual memo. But it does say that the purpose of the accommodation is to integrate you back into the office set. Okay. What else? What other evidence in this record says that it's an essential function? Where that y'all had taken that position? All right. If you look at the overall facts of the circumstances which took place in this case, first of all, look at the nature of the job, the need to... She was required as part of her job to be... And she testified that she needed to do all these things. She needed to be able to attend depositions. She needed to be able to go to court. Those are not in the office. She needed to be able to interact with her secretary and with other attorneys in the office. She had a supervisor who supervised her work. And you say it's not in the office. I understand that. But the ability... Her claim is, I can't come into the office because of my kidney, my immune issues. And therefore, I can't be in the office at all, can't be around people. It's undisputed and it's in the record. She had a closed office that she could come into and close the door. She didn't have to be exposed to people the entire day or anything like that. And yet, she wants to fly to Oregon and go take depositions, fly on a plane, on a commercial plane, and go take depositions for four days in Oregon and then fly around people and fly back. Okay, we want to finish this up. Is there anything else you want to point us to in the record on this point? Well, I think as the court's ruling reflected, the court's ruling looked at, from a common sense standpoint, the nature of the work that was required to be done. Okay, is there contrary summary judgment evidence in the record? Is the evidence that the other employee was allowed to do this for a year, contrary evidence in the record? Your Honor, I do not believe that there's contrary evidence. Number one is, when she talked about Bill Belsom, the only evidence in there is a plaintiff's statement that Bill Belsom worked out of the office and worked away from home. The supervisor who was involved in this case said she was familiar with Mr. Belsom but did not know his circumstances, did not supervise him, and did not have any knowledge of whether he was a comparator, whether he did the same kind of work, or any of that stuff. And she produced no evidence of anybody who testified as to what Mr. Belsom's job was, what he did, and whether he was a comparator, and whether he was in fact out for what period of time other than her testimony by the plaintiff herself, which said he was out of the office. I understand he was out of the office. But there's no evidence in the record of any comparator who was allowed to permanently work in litigation outside the office. No, Your Honor. And if you look at the brief, the things that she talked, the other comparators that she talked about was the supervisor, Ms. Mallard herself, who said she worked from home. Well, she said, yes, I'm the supervisor of the litigation division of the Attorney General's office. There is times when I may have to bring some work home with me. But I work regularly in the office. I did not work from home in lieu of working in the office. And, you know, there's a big distinction there. And the other people that she points out are not people who worked from home in lieu of working at the office. They worked at the office full time. You know, again, in the issue of the quality. You agree that this whole case turns on the definition of essential function. I don't agree with that, Your Honor, because even if we went beyond the essential function issue, I think we're entitled to summary judgment on the issue of whether or not we granted a reasonable accommodation or not. And if you look at this, let's start. Counsel talks about in 2010. But whether or not your accommodation is reasonable is based on your view that showing up at the office is an essential function of that job. Is that right? I agree. But if you look at the history of where this case went from start to finish, you see accommodations over and over again. One of the things that counsel is talking about is this FMLA and that we denied her FMLA. When, in fact, the only testimony in the record from the human resources person is that she was granted FMLA during that extended period of time that she was off, even though she didn't qualify because she hadn't worked enough hours in the preceding year. But they gave it to her anyway. I thought the record shows it was taken away from her, that the time off without pay was originally classified as FMLA and then recategorized. No, Your Honor. If you look at the summary judgment evidence that we presented. Where would we look for that? It's in Ms. Schober's deposition testimony along with the information in our brief. They granted her the FMLA. She received the full FMLA and it expired. Then she went on leave without pay for another several months until August 22nd of 2014 when she came back. And they were giving her assignments while she was on leave without pay? No, Your Honor. Did she have emails from her supervisor saying do this work? Nobody has testified that they gave her any assignments to do. Look at the record and see what emails you have of work that was being done. And in fact, she was asked when she didn't want to turn in these time certifications. She was asked. She said they're not right. She was asked, well, correct them. If they're not right, correct them. And for months and months and months, she refused to do that. And she didn't say, I can't do it because I can't remember it. She kept saying, I will do it. But why would she be turning in time certifications if she wasn't doing any work? Because the time. Her position is that she wasn't actually working there. Yeah. And Your Honor, the time certifications are different than what she's talking about. It was not daily time sheets that are filled out. The time certifications, every pay period as part of the records that are kept within the Attorney General's office, which are given to the legislative auditor, they're required to fill out a certification that says I was either worked or was on approved leave during the period, during this pay period. And that's all it asked her to do. I was, I either worked or was on approved leave. That's what the certification asked for. And that's all she was asked to sign as part of that certification. Okay. Can you deal, one troubling aspect of this case is that whenever she was, came back part time, she was forbidden from working at home during that time, perhaps, according to the, to her, her view of the case. Is it true that she was forbidden from working at home when she was sent back part time? Judge, she says that she was forbidden from working from home. Is there evidence in the record that would support that? The strategy memo says you come back into the office, you work, as your doctor says, you work the three to four hours a day as tolerated until you're able to reintegrate back into the office. But it also says not at home. It doesn't say, well, I don't know. It may say, it may say not at home. But, but that was the idea to reintegrate and also to, to reassign some of the caseload from her that she was not able to keep up with in order to allow her to do that. Well, wouldn't she have been able to keep up with the caseload, perhaps, if she'd been allowed to work at home the other, if she's got to be in the office three or four hours a day, why are you forbidding her from working at home during the other part? What, how has that accomplished your, the employer's goal? She's allowed three to four hours a day as she can tolerate. If she could only come one hour a day, we were willing to accept her to come one hour, one hour a day, as long as she came to the office to work. It was three to four hours a day as tolerated. Right, and she is coming into the three to four. Why is she forbidding her from working? She never did come back at all, though, Your Honor. She never did come back to work in the office at all. Did you get your answer? I don't know that I've gotten the answer. Well, here's what, I have a question in connection with that. I want to make sure I understand whether or not you're accepting the premise, because I read the note, the memo, the email, whatever it is that says not to work from home. Okay. And my understanding of that is to say, we're going to pay you for the three or four hours that you come into the office. You are not going to be paid from any work you do from home, but I don't know how anyone could direct me not to work from home and then police whether or not I do it. So I would never understand that statement to mean that my employer is somehow forbidding me from looking at any work at home, reading any work at home. But you can say to me, any time sheets or any submissions that are made from you for any hours that you claim to have worked at home, you're not going to be credited for that and you're not going to be paid for that. So my understanding of not to work from home was you're not going to be paid for any work you do from home. But are you accepting that the DOJ, which apparently is what y'all call the Attorney General's office in Louisiana, are you accepting that the DOJ forbid her working from home? Is that what that meant? It was simply an opportunity for the DOJ to be able to integrate her back into the office. The statement is she's not to work from home. The goal was to get her back into the office. So what are you going to do if she does? You tell somebody not to work. I guess you expect her to self-report. I did some work. There's no consequences for doing that. But the idea is for her not to continue the process that has not been working for five months and to move to this other accommodation to allow her to reintegrate back into the office, Your Honor. That's the point of it. What if the record says it was not working for the five months? OK, there's a number of testimony by her supervisor, Mr. Reyno, that's in the record. Do you want to refer me? I can refer you to, from the brief, what he talked about is problems that they encountered. There's a number of times when they're receiving calls, information to the office, people calling in from his crater trying to find out when discoveries going to get submitted and get information on panels and so forth. She's not there. He's fielding, the supervisor's fielding those calls. The secretary's fielding those calls. They have him send those over to her. Having to get postponements of discovery responses and panel hearings because she's behind on her work during the time that she's working from home. The supervisor had to transfer some cases from her, particularly a case in February 2014 when it was coming up for trial. They had to get another attorney to handle the case because they didn't know if she would be medically cleared to be able to go and try the case. And she was failing to do these routine administrative tasks. Things like these timesheets, it didn't start in 2014. It went back all the way to October 2013. She's not turning in her timesheet. She's not doing her driver's authorization form. She's not doing her safety training and repeated requests, repeated requests to take care of these things and she's not taking care of any of these things during the time period that she's working from home. So these are some of the things. Additionally, one of the things that was in the last chance agreement that was talked about is these administrative charges, billing to administrative time for significant amounts of time rather than billing to particular files. And one of the problems with that, and Ms. Craig testified to that, was that she needed to take that, she was using that administrative time because she's got to have these telephone meetings with her paralegals and her secretary and so forth to get up to speed on what's going on in the, you know, in her cases and what's going on in the office and to, you know, assign tasks and to do all these kind of things and all this is being done or attempting to be done remotely. And so we got a lot of administrative time. But it's not administrative time that she had before she was working from home. It's much greater administrative time. So these are the items that I can note off that are in the brief that we provided some record evidence on. That the last chance agreement, what is the, it's my understanding that these kinds of things are when you have a performance problem and you've worked on a performance, it's like a, you try to give them some counseling and so you do this for a performance problem and it expels out specifically and some, every once in a while one of these works out. But for the most part, it's just letting the person know that probably they're going to be fired eventually. Because is that the same way that those are used there according to the record? There is testimony that they have been used before. I don't know if in those cases that they were used before the person was fired. But I mean, is that the kind of way you use them, right? What their deficiencies are and try to counsel them, to remedy them? Is that what you understand in this agreement? It would be correct in that, you know, the whole point of this was to point out these problems and there were a couple of really significant problems, particularly in some insubordinate communications, emails about supervisors and about, you know, and two supervisors that needed to get pointed out, needed to get corrected. But, and just so I finish my sentence, there was no really adverse action at all taken with respect. But you refused to sign it. She said that there were some things in there that were incorrect, yet she never provided any information or anything to tell us what she believed was incorrect within the agreement. You're not agreeing that a last, what Louisiana calls, and I guess I like it, it's pretty candid, a last chance agreement, this is your last chance. Other states call them performance improvement plans. But you're not agreeing that when you say to a government worker, these are the things you need to improve on, and if you don't, then there could be disciplinary action taken against you. You're not saying that that's just a euphemism for letting them down easy and you're going to be fired in six months. We're just letting you know now that it's going. I mean, that's not the purpose of an agreement like that, is it? If she does what is asked for in the last chance agreement, if she corrects the deficiencies, then no, she's not going to be let go. She was not let go. In fact, she continued to work. Even after missing another five months of work, she came back on August 22nd, full-time employee, completely medically cleared, and worked until December 31st of 2014 when she voluntarily resigned. She was never, there was never really any disciplinary action at all taken against her. I'm down to 18 seconds. Is there anything else, Your Honor? No, sir. Thank you. I know that I have a whole lot of time, but to answer your question with respect to the but also the record on appeal numbers, and this is what it says in the last chance agreement. It's not some sort of, gee, you need to pick up the trash or else you're going to be in trouble. It says, Renee must, quote, work up to three to four hours per day in office in parentheses as tolerated, and, quote, not work from home. She was also required in the last chance agreement to update at least five persons. How would you interpret a not work from home statement? What does that mean? That means she can't do anything. She's not going to get any compensation. She's not allowed to work at home at all. It's the same thing that they said. No, no, no, no, no. That's a different thing to say you're not allowed to work at home and to say I'm not going to pay you for work you do from home. I don't know how they could police whether or not you actually work from home. Well, I'm kind of with you on that. But isn't that your complaint that they forbid her from working at home? Yes, and that's what they said in that document, the last chance. Quote, not work from home. They couldn't have really meant that we're going to. Well, they sure didn't in the October 13 memo that she asked about. The October 2013 quote strategy memo by Millette came after the Dr. Slakey, the kidney transplant doctor, his note on 9-16-13. Know what he said? This is what he tells the attorney general's office. I like her. I'm releasing her to slowly integrate or incorporate, were his words, back into the workplace, maybe three to four hours a day. But she needs to continue to work from home. That then gets translated in Sonia Millette's mind into you can only work at the office. That's the October 2013 memo. I asked Sonia Millette in her deposition what she meant by that. What are you talking about? And what she basically says is, I said, who told you that? Dr. Slakey didn't. Here's his note. Well, that's what we were going to do. We didn't believe she was integrating herself back into the workplace. So she was only going to be allowed to work in the office. Counsel, on this whole, and I want to ask about this for a minute, on this whole essential function definition, I mean, the fact is, I don't have a policy in my chambers that says, written in advance, you need to show up for work. I kind of get really upset if people don't. But my point is, isn't it kind of an assumption that I need you to come into the office? If I hire you at the Attorney General's office in Louisiana, isn't it just kind of common knowledge that I expect my employees to come into the office? We have this building and these spaces and some chairs and, isn't it? So to say that they kind of post hoc developed this essential function definition and description, I mean, that would likely be the case for a lot of employers, wouldn't it? Except that that's a question of fact. In this particular circumstance, as the statute says, we're going to defer to an employer's written job description posted before hiring or interviewing. In this particular... Well, it is concerning that they don't have a written job description and that their government... My client's sick again. The point to it, from a circumstantial evidence standpoint, is we have a non-disabled guy in the same division who gets accommodated simply because his wife's in medical school in another state. Forever? He can work forever in another state? Is that in the record? That he can work as long as he's employed with the DOJ? He never has to come into the office? Is that in the record? No, because everyone I asked you, I'm telling you, who I don't really remember, but we do have in the record at R08-667, can you tell me whether or not the attorney general's office has any policy regarding working from home for attorneys? Answer, no, I don't. This is Tanya Millett. Question, were you aware of another employee in the civil division whose wife was in medical school and was given a placement somewhere else and he was allowed to work from home in another state? Answer, I'm aware that there was that situation. Question, who was that employee? Answer, Billy Belsom. How is that spelled? B-E-L-S-O-M. It's ridiculous for the attorney general's office to say it was okay for Renee Crater after her transplant. It was okay when she had these issues. It's certainly okay for some non-disabled guy to go hang out in Georgia and work, but all of a sudden we get a new supervisor and it's not okay for her. That's not what the ADA was designed to do. When you look at the statute in terms of undue burden, that burden's on them by a preponderance and it's certainly not proper fodder on summary judgment. Thank you. Thank you. Thank you.